Brooke SHIELDS, An Infant, By Teri SHIELDS, Her Mother, Having Legal Custody, Plaintiffs,

v.

Garry GROSS and Art Trend Creations, Inc., Defendants.

No. 83 Civ. 3319 (PNL).

United States District Court, S.D. New York.

May 13, 1983.

Sandor Frankel, Bender & Frankel, New York City, for plaintiffs.

A. Richard Golub, New York City, for defendant Garry Gross.

Samuel Ulrich Wiseman, New York City, for defendant Art Trend Creations.

## ORDER

LEVAL, District Judge.

Plaintiff Brooke Shields is a well known 17-year-old model and movie star. She seeks a preliminary injunction against the marketing or public display of certain photographs taken of her in the nude by defendant Garry Gross. Gross has licensed defendant Art Trends to make and sell artistic prints based on the photographs. Shields claims entitlement to relief under a right of privacy which she contends is guaranteed by the Constitution. I find for two independent reasons that the motion for preliminary injunction must be denied. First is want of equity. Plaintiff's counsel has conducted this litigation and timed this application for preliminary injunctive relief in a manner designed to impose unnecessary unfairness on the defendants. Plaintiff's timing strategy is an abuse of the equitable remedy. Second, plaintiff has failed to satisfy the conventional test for entitlement to preliminary injunctive relief.

### I. *Background*

In 1975, when plaintiff Brooke Shields was 10 years old, she and her mother, plaintiff Teri Shields, reached an arrangement with Gross, a commercial photographer, for these photographs to be taken. Brooke

Shields was paid $450 for the photo sessions by Playboy Press, and her mother signed a release giving Gross unlimited rights to use or publish the photographs. Some of the photos, those in controversy, were posed naked.

These photographs have been displayed or published in a variety of ways. Two in particular, which plaintiff characterizes as the most revealing, appeared in 1976 in a Playboy Press publication entitled *Sugar & Spice* and, in larger-than-life-size enlargements, in the windows of a fashionable boutique on Fifth Avenue in New York.[1] More recently, some of the photographs have appeared in at least five publications, some of them decidedly disreputable.

For the last two years plaintiff has litigated in the New York state courts to prevent the distribution of these photographs. Her suit was based on two legal theories: first, she contended that the consent given at the modelling session was either invalid or to be narrowly construed. This contention was rejected by the trial court, and the ruling was affirmed on appeal. Second, she contended that she is entitled under the common law of New York to disaffirm her mother's consent. This too was rejected at trial; the Appellate Division reversed and enjoined Gross from using the photographs "for purposes of advertising or trade." *Shields v. Gross*, 88 A.D.2d 846, 451 N.Y. S.2d 419 (1st Dep't 1982). The Court of Appeals, however, vacated the Appellate Division's injunction, 58 N.Y.2d 338, 461 N.Y.S.2d 254, 448 N.E.2d 108 (1983), ruling against Shields. Plaintiff asserted no federal claims in the New York courts.

Throughout the pendency of that action, the New York courts granted plaintiff interim injunctions forbidding Gross from displaying the photos. The last of these expired when the Court of Appeals denied her motion for reargument late on Friday, April 29, 1983.

On Monday morning, May 2, 1983, the first business day after the expiration of the state injunction, plaintiff commenced this action by filing a complaint which asserts that the distribution of the photographs would infringe plaintiff's federal constitutional right of privacy.

Simultaneously with the filing of the complaint, and without giving notice to the defendants, plaintiff moved for a preliminary injunction and a temporary restraining order. Defendants somehow learned of the application and telephoned the clerk requesting that no action be taken without their being heard. They appeared in court and agreed voluntarily to refrain from distributing or displaying the photos for the brief time needed to complete the submissions on the preliminary injunction motion. All parties have now completed their submissions, and the preliminary injunction motion is ripe for decision.

## II. *Discussion*

### A. *Want of Equity*

For two years, although litigating a losing cause in the state courts, plaintiff has successfully prevailed over the defendant by an unbroken series of interim injunctions. Now after running that course to its conclusion, plaintiff seeks to begin a new round of interim injunctions effectively securing complete relief for as long as the courts are willing to maintain such relief pending final adjudication. Defendant meanwhile runs the risk that by the time plaintiff runs out of courts and legal theories and exhausts the temporary restraining orders, preliminary injunctions, stays pending appeal, reconsideration and certiorari, the market for defendant's pictures will have disappeared.

The point here underlined is that plaintiff could have sought adjudication of her federal constitutional rights at any time during the pendency of the state interim injunctions so that decision of these questions would not have called for a new round of

1. An unrevealing photograph in which the side of the bathtub covers all below the shoulders was published by *Time* magazine and by plaintiff herself in an autobiographical book. The publication of this unrevealing photograph seems to have little bearing on the issues in dispute.

status quo injunctions at the defendant's expense and risk.

Instead, by seeking consecutive rather than concurrent adjudication of these issues, plaintiff's counsel has calculated his timing strategy precisely to maximize the duration of interim injunctions. This clearly appears from the papers and the calendar of their submission. As noted above, this action and the companion motion for injunctive relief were filed on the first business day following the expiration of the last reconsideration of the state ground by the highest court of New York. The federal complaint is a carefully drafted document pleading an imaginative ground-breaking legal theory. The papers in support of the motion include a thirty-page memorandum of law, citing numerous authorities and reviewing the history of decisions discussing a federal constitutional right to privacy. A well known professor of the Harvard Law School is listed as "of counsel" on the brief. It is reasonable to infer that this theory and these papers were not conceived in desperation at midnight following the last rejection by the Court of Appeals.

But even if they had been, the point would remain that this conditional claim could perfectly well have been litigated earlier. Plaintiff argues that the federal theory would have been unripe for adjudication prior to state disposition, because the federal theory depends on the state judgment as the necessary element of state action. This argument is an inadequate response. Even accepting plaintiff's hypothesis, from the time of the decision of the state trial court against plaintiff, there was a state judgment upon which the federal theory could have been founded. Had such a suit been filed at that time in federal court, it is of course possible that the federal court might have awaited the decision of the highest state court before making a decision. It might also, however, have considered the issue without waiting, precisely to avoid this unfairness to the defendant. In either case defendants would not have been taken by surprise and could have fully briefed and prepared the federal case during the state proceedings without being subjected to ad-

ditional consecutive time under injunction. Instead plaintiff's federal theory was held in secrecy from the defendants who were therefore unprepared when the new action was sprung on them on plaintiff's carefully and elaborately prepared papers.

In addition, plaintiff could have joined the federal constitutional claim with the state causes of action for adjudication in the state court. State courts have jurisdiction over suits under 42 U.S.C. § 1983. The federal constitution is the law of the land governing the state court to the same extent as the federal court. The state court is as capable of adjudicating constitutional rights as the federal court, and there is no reason to suppose that the state court would be any less receptive to claims of this nature. The constitutional claim could therefore have been litigated simultaneously with the state law contentions without occasion for consecutive holding injunctions. (A further point worthy of mention is that by the second separate litigation, the wealthy plaintiff unfairly imposes a new round of expenses on the relatively impecunious defendant.)

In this circuit a plaintiff who does not assert federal constitutional grounds in prior state proceedings seeking the same relief is not precluded from litigating those claims in federal court. *Gargiul v. Tompkins*, 704 F.2d 661 (2 Cir.1983). But it does not follow that a new round of preliminary interim injunctions and stays will issue pending final decision against a defendant who has already won a Pyrrhic victory in state court involving two years of injunctions. Plaintiff may maintain her action in this court. If she wins, she may be entitled to damages. She may conceivably also obtain a permanent injunction. But in the meantime, this court will not accord a status quo injunction at the defendants' expense and risk to reward the inequitable strategy waged by plaintiff's counsel. I conclude that plaintiff's strategy was designed to and would take unfair advantage of equitable remedies if preliminary injunction were granted, and deny the preliminary injunction.

**1256**

### B. *Failure to meet the standards for preliminary injunction*

 Under this circuit's law, an applicant for a preliminary injunction must show irreparable harm and in addition submit proof sufficient to pass one of two tests: she must show either likelihood of success on the merits or serious questions for litigation with the balance of hardships tipping decidedly in her favor. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *Jack Kahn Music v. Baldwin Piano & Organ,* 604 F.2d 755, 758 (2d Cir.1979). I find that she fails to show likelihood of success on the first branch and balance of hardships on the second.

#### 1. *Weakness of plaintiff's case on the merits*

It is not every day that the First Amendment is cited as authority requiring prior restraint of a publication through court censorship. Indeed, it is conventional wisdom that its thrust is decidedly in the opposite direction. *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Plaintiff makes an elaborately constructed argument which depends, first, on a line of cases recently summarized in *Gargiul v. Tompkins, supra,* at 669 (Oakes, J., concurring) to the effect that the First and other Amendments to the Constitution protect a right of privacy and, second, on a finding that the state court's refusal to invalidate the consent is governmental action violating this right. There are no decisions giving clear support to the existence of such a cause of action. *Cf. Flagg Brothers v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The closest may be Judge Cooper's suggestion in *Galella v. Onassis,* 353 F.Supp. 196, 232 (S.D.N.Y.1972), *aff'd on other grounds,* 487 F.2d 986 (2d Cir.1973), that the Constitution might require of state law that it bar a photographer's egregious harassment of his target.[2]

However the hurdle plaintiff must overcome involves not merely whether a cause of action exists; it involves whether such a cause of action commands or authorizes an injunction against publication. As noted above, whatever support may be found for the existence of such a *cause of action,* the entry of an injunction barring publication is another matter. *Cf. Ann-Margret v. High Society Magazine Inc.,* 498 F.Supp. 401 (S.D.N.Y.1980); *Girl Scouts of USA v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228, 1234 (S.D.N.Y.1969).

Plaintiff has not shown that she is likely to succeed in obtaining a permanent injunction on the merits. Indeed it is doubtful whether there is a fair question for litigation on the availability of a permanent injunction against publication.

#### 2. *Balance of Hardships*

Plaintiff claims that she will suffer irreparable harm, embarrassment and personal distress from the publication of these photographs. A number of factors diminish the force of her contentions.

First, there has already been substantial dissemination of nude photographs of plaintiff. Some of the most revealing of those now before the court were previously exhibited in a magazine and in a fashionable shop window. Another nude photograph by a leading fashion photographer, Francesco Scavullo, was published in an album entitled *Scavullo on Beauty.* Plaintiff also appeared nude in the role of a child prostitute in the highly publicized and widely distributed feature film "Pretty Baby."

Second, much of plaintiff's recent commercial activity upon which her fame is based has been far more sexually suggestive than the photographs which have been shown to the court. These photographs are not sexually suggestive, provocative or pornographic; they do not suggest promiscui-

---

**2.** Plaintiff also argues that her constitutional rights in this action are enhanced because she is a minor. The cases she cites, *e.g., Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1978); *New York v. Ferber,* —— U.S. ——, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), do not support her.

ty. They are photos of a prepubescent girl in innocent poses at her bath. In contrast, defense counsel have submitted numerous samples of sex-oriented publicity concerning plaintiff. Particularly notable is her widely televised sexually suggestive advertisement for blue jeans. Recent film appearances have been sexually provocative (*e.g., "The Blue Lagoon", "Endless Love"*). Plaintiff's claim of harm is thus undermined to a substantial extent by the development of her career projecting a sexually provocative image.

Although it may be questioned whether she has made an adequate showing of irreparable harm, I do not make a finding on that issue. I do find that she has failed to show a balance of hardships tipping decidedly in her favor.

Highly relevant to this conclusion is the issue of successive injunctions, discussed above, and the resulting harm to defendants. Also, defendants have submitted convincing proof that their photographs are now highly marketable. They have been restrained from distributing them for two years. Whether the photographs will continue to be marketable, and for how long, is entirely speculative. Brooke Shields is now famous and apparently the subject of widespread public interest. The fragility of such reputations is obvious; with the smallest change in any of a number of directions public interest in the photographs could disappear. A bond is not a satisfactory protection. If defendants cannot market their photographs, it will be virtually impossible for them to show what profits might have been earned.

Defendant's "victory" in the state courts has been a financial disaster for them. After two years of injunction and one completed lawsuit, plaintiff has not yet shown entitlement to the relief she seeks. Defendants have suffered substantial harm which would be compounded by further interim injunctive relief. They have been unfairly burdened by the litigation strategy of plaintiff's lawyers. I find that the balance of hardship favors the defendants.

They are now entitled to be free of court restraint.

SO ORDERED.