**Rosa Maria CABALLERO, Plaintiff,**

v.

**Reynold V. ANSELMO and Julian M. Kaufman, Defendants.**

**No. 85 Civ. 2386 (IBC).**

United States District Court, S.D. New York.

March 15, 1991.

As Amended March 20, 1991.

---

Dow, Lohnes & Albertson, New York City (Joseph F. Kelly Jr., of counsel), for plaintiff Rosa Maria Caballero.

Lowenthal, Landau, Fischer & Ziegler, New York City (Lawrence L. Ginsburg, of counsel), for defendant Reynold V. Anselmo.

## MEMORANDUM AND ORDER

IRVING BEN COOPER, District Judge.

Plaintiff Rosa Maria Caballero commenced this action March 27, 1985, to recover four thousand five hundred forty six (4,546) shares of stock ("the stock") in Spanish International Communications Cor-

poration ("SICC") which she alleged were improperly sold by defendant Reynold V. Anselmo to defendant Julian M. Kaufman. Both Anselmo and Kaufman were directors and shareholders of SICC at the time of the alleged improper sale.

Pursuant to plaintiff's motion, we bifurcated the action with respect to the issues of liability and damages. The liability issue was tried before this Court in April, 1986. At the close of plaintiff's case, defendant Kaufman moved for a directed verdict pursuant to Federal Rule of Civil Procedure 50, and defendant Anselmo moved to dismiss pursuant to Federal Rule of Civil Procedure 41(b). We reserved decision on both motions. In an opinion dated September 7, 1989, we found in favor of plaintiff against defendant Anselmo on the grounds that Anselmo had wrongfully converted the shares of plaintiff's SICC stock; all claims against defendant Kaufman were dismissed. *Caballero v. Anselmo*, 720 F.Supp. 1088 (S.D.N.Y.1989).

At that time we directed plaintiff and defendant Anselmo to endeavor to agree upon a reasonable and proper amount of damages, and to provide us with a proposed form of judgment including such amount agreed upon within 60 days. The parties were not able to reach an agreement on the amount of damages. After numerous conferences, counsel agreed that another trial was not necessary for the court to determine the legal damages issues (letter to Court from Joseph F. Kelly, Jr., Esq. dated November 7, 1990 and letter to Court from Lawrence L. Ginsburg dated November 14, 1990) and submitted papers in support of their respective positions regarding the formula for measuring damages owing to plaintiff and whether plaintiff is entitled to punitive damages as a result of the conversion. We shall address each issue separately below. The facts of the case are set out at length in our opinion, 720 F.Supp. 1088; familiarity with them is assumed.

## DISCUSSION

### I. *Measure of Damages*

Plaintiff seeks recovery under alternative theories: she argues that we should either impose a constructive trust upon the stock and declare defendant a constructive trustee thereof or apply a conversion theory of damages. Plaintiff argues that under either theory she is entitled to judgment equal to the highest value of the stock between the time of conversion and the time of judgment, to wit, proceeds in the amount of $1.5 million resulting from a transaction that occurred in July, 1986 ("the July 1986 sale"). We will analyze each of plaintiff's theories in turn.

### A. *Constructive Trust*

Plaintiff argues that we should impose a constructive trust upon the $1.5 million proceeds of the July, 1986 sale of plaintiff's stock by Daniel Villanueva to a third party, and determine that defendant Anselmo, as constructive trustee, owes plaintiff the full amount. Plaintiff's Memorandum Of Law In Furtherance Of The Assessment Of Damages at 11–14 ("Plaintiff's Memo"). Defendant argues that we should not impose a constructive trust because the application of a constructive trust theory of damages is not appropriate in conversion cases, and even if appropriate, a constructive trust can only be imposed against entities who are in possession of the converted property or the proceeds thereof. In short, defendant argues that if we do declare him constructive trustee, it can be only for the $15,000 proceeds realized when he sold the stock to Kaufman in May, 1973. Defendant Reynold V. Anselmo's Memorandum Of Law With Respect To The Determination Of Damages at 9 ("Defendant's Memo"). For the reasons set forth below, we agree with defendant to the extent that the imposition of a constructive trust is not appropriate in this action.

The constructive trust may be defined as a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs.... If the property has been sold the trust attaches to its proceeds in the hands of the defendant, or to the other property purchased by defendant into which the original

property or its proceeds can be traced....

If one has possession of personal property under such circumstances that appropriation of it to his own use ... will make him guilty of the tort of conversion ..., the wronged person may charge the converter as a constructive trustee of the converted property or of cash proceeds or property he receives by reason of a sale of the property converted.

Bogert, *Law of Trusts and Trustees*, § 471 at 3–5, § 476 at 125–132 (rev. 2d ed. 1978) (footnotes omitted).

A constructive trust will be imposed where "property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919); *Scull v. Scull*, 94 A.D.2d 29, 462 N.Y.S.2d 890 (1st Dep't. 1983), *aff'd* 67 N.Y.2d 926, 493 N.E.2d 238, 502 N.Y.S.2d 135 (1986); *Coco v. Coco*, 107 A.D.2d 21, 485 N.Y.S.2d 286 (2d Dep't. 1985).

Under New York law, the general legal requisites for imposition of a constructive trust are (1) the existence of a fiduciary or confidential relationship, (2) a promise, express or implied, (3) a transfer in reliance on the promise, and (4) unjust enrichment. *Kopelman v. Kopelman*, 710 F.Supp. 99, 102 (S.D.N.Y.1989); *Bankers Sec. Life Ins. Soc. v. Shakerdge*, 49 N.Y.2d 939, 406 N.E.2d 440, 428 N.Y.S.2d 623 (1980); *Hutton v. Klabal*, 726 F.Supp. 67 (S.D.N.Y.1989). Generally, a constructive trust must be proved by plaintiff by clear and convincing evidence. *Schmieder v. Hall*, 421 F.Supp. 1208 (S.D.N.Y.1976), *aff'd*, 545 F.2d 768 (2d Cir.), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1601, 51 L.Ed.2d 805 (1977).

We approach our analysis of these factors with a certain elasticity. The constructive trust remedy is flexible, and "it has ... been held that, 'although the [above-mentioned] factors are useful in many cases constructive trust doctrine is not rigidly limited,' *Simonds v. Simonds*, 45 N.Y.2d 233, 241, [380 N.E.2d 189, 194,]

408 N.Y.S.2d 359, 363 (1978), and a constructive trust may be found even in the absence of these prerequisites when ... equity and common sense require." *S.E.C. v. Levine*, 689 F.Supp. 317, 323 (S.D.N.Y. 1988). *See Lines v. Bank of America Nat. Trust & Sav. Assoc.*, 743 F.Supp. 176 (S.D. N.Y.1990); *Hornett v. Leather*, 145 A.D.2d 814, 535 N.Y.S.2d 799 (3d Dep't.1988), *appeal denied*, 74 N.Y.2d 603, 541 N.E.2d 425, 543 N.Y.S.2d 396 (1989); *Reiner v. Reiner*, 100 A.D.2d 872, 874, 474 N.Y.S.2d 538, 541 (2d Dep't.1984). However, in those instances, plaintiff must at least show a promise and a transfer of property. *Chipman v. Steinberg*, 106 A.D.2d 343, 483 N.Y.S.2d 256 (1st Dep't.1984), *aff'd*, 65 N.Y.2d 842, 482 N.E.2d 925, 493 N.Y.S.2d 129 (1985); *Plotnikoff v. Finkelstein*, 105 A.D.2d 10, 482 N.Y.S.2d 730 (1st Dep't. 1984).

We defer for a moment any discussion of whether a fiduciary relationship existed between plaintiff and defendant, and we turn to address the other factors. First, no promise was made by defendant to plaintiff's father or to plaintiff. Defendant made no promise to hold the stock for plaintiff's benefit, nor was there a promise to convey the stock to a third party for plaintiff's benefit. At most there was an agreement whereby defendant and plaintiff's father agreed that plaintiff would retain title to the stock and defendant would vote her interest. This, we conclude, is insufficient to establish that a promise had been made to plaintiff.

Second, plaintiff has not shown that she or her father made a transfer at all. Even assuming that a voting right was given, no transfer of title was made nor intended. The stock remained in plaintiff's name while defendant had possession of the stock or stock certificate. In order to establish a constructive trust it is necessary to show that defendant wrongfully obtained title rather than mere possession. *Edwards v. Rector, Church Wardens and Vestrymen of Trinity Church in City of New York*, 5 F.Supp. 335 (S.D.N.Y.1933), *aff'd*, 77 F.2d 884 (2d Cir.1935), *cert. denied*, 296 U.S. 628, 56 S.Ct. 151, 80 L.Ed.

446. Based on the evidence and the arguments of the parties, we conclude that nothing more than mere possession was transferred, and that is not sufficient to give rise to our imposition of a constructive trust.

In order for plaintiff to show the third factor, that a transfer was made in reliance on a promise made by defendant, she would, logically, need to establish that defendant made a promise (the second factor), she made a transfer, and the transfer was in reliance of that promise. None of those elements are present. It follows, then, that if no promise was made by defendant and no transfer was made or intended by plaintiff or her father, then plaintiff made no transfer in reliance on any promise by defendant.

■ Most importantly, plaintiff has not convinced us, nor can we find, that defendant was unjustly enriched by the sale of the stock. The proceeds of the sale amounted to $15,000, the amount plaintiff's father originally paid for the stock. Defendant offered to return $10,000 to plaintiff's father (the other $5,000 was applied to pay off a loan made by the corporation to plaintiff's father). When plaintiff's father refused the $10,000, defendant held the funds in various accounts for plaintiff. Tr. 260–63. Plaintiff has not offered any evidence indicating that defendant appropriated the funds to his personal use, nor is there any other indication that defendant benefitted personally from the sale. Consequently, we are compelled to conclude that defendant was not unjustly enriched. The "essential purpose of a constructive trust is to prevent unjust enrichment." *Coco v. Coco, supra,* 107 A.D.2d at 24, 485 N.Y.S.2d at 288. There was no unjust enrichment to be prevented in the instant action; therefore, a constructive need not be imposed.

Finally, we do not pass on whether a fiduciary relationship existed between defendant and plaintiff because even if such a relationship did exist, the absence of the three other factors would preclude us from impressing a constructive trust upon the stock or the proceeds thereof. *See In re Black & Geddes, Inc.,* 35 B.R. 830 (S.D.N.Y.1984) (a constructive trust should not be based solely on the existence of a fiduciary or close relationship).

In short, the evidence and arguments offered by plaintiff are insufficient to support the imposition of a constructive trust upon the stock as against this particular defendant. Plaintiff has not proven the existence of factors that would support our imposing a constructive trust; furthermore, neither equity nor common sense require the imposition of a constructive trust in the absence of the factors discussed above. *Bertoni v. Catucci,* 117 A.D.2d 892, 498 N.Y.S.2d 902 (3d Dep't.1986). Consequently, we decline to impose a constructive trust upon the stock or the proceeds of the sale thereof in favor of plaintiff. Finally, because we found that imposing a constructive trust is inappropriate in the instant matter, we decline to address plaintiff's argument regarding trustee liability which was based on our imposition of a constructive trust.

### B. Conversion Measure of Damages

In order to determine the proper amount of damages owing to plaintiff as a result of defendant's act of conversion, we must fix a valuation date for the stock. Critical to this analysis is our determination of what constitutes a "reasonable time" after discovery of the conversion by plaintiff, within which the stock should be valued.

■ Under the general rule, damages recoverable for the conversion of property are limited to the value of the property at the time of the conversion. 23 N.Y.Jur.2d, *Conversion,* § 68, at 296–99 (1982). However, an exception applies to property of fluctuating value, such as shares of stock: "[t]he measure of damages for conversion of stock certificates is the cost of replacement within a reasonable period after the discovery of the conversion, regardless of when the conversion may have occurred." *Hartford Acc. & Indem. Co. v. Walston & Co., Inc.,* 22 N.Y.2d 672, 673, 238 N.E.2d 754, 754, 291 N.Y.S.2d 366, 367 (1968); *see also Gelb v. Zimet Bros., Inc.,* 34 Misc.2d 401, 228 N.Y.S.2d 111 (Sup.Ct.1962), *aff'd,* 18 A.D.2d 967, 237 N.Y.S.2d 989 (1st Dep't.

1963). "The question of what constitutes reasonable time after knowledge or notice of the wrongful sale for the purpose of measuring damages depends upon the circumstances of each particular case. No fixed period is prescribed by law nor is there any rule of thumb by which such period can be ascertained" *Phillips v. Bank of Athens Trust Co.*, 202 Misc. 698, 702, 119 N.Y.S.2d 47, 52 (Sup.Ct.N.Y.Co. 1952), "but the injured party is not actually required to reenter the market in order to determine when he might have done so." *Schulz v. CFTC*, 716 F.2d 136, 140 (2d Cir.1983).

The purpose of the reasonable time rule is to allow the plaintiff "reasonable opportunity to consult counsel, to employ other brokers and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase." *Gelb v. Zimet Bros. Inc.*, 34 Misc.2d 401, 402–3, 228 N.Y.S.2d 111, 113 (Sup.Ct.N.Y.Co.1962). "Tempering that law is that ever present mandate that the injured one shall keep down the damages." *Hayward v. Edwards*, 167 Misc. 694, 695, 4 N.Y.S.2d 699, 701 (Sup.Ct.Queens Co.1938). Further, the rule does not apply only in cases where defendant acted in good faith or because of an honest mistake, but also where the conversion was inspired by dishonest motives. *Gelb v. Zimet, supra*, 34 Misc.2d at 404, 228 N.Y.S.2d at 114.

Plaintiff and defendant do not dispute the rule for fixing a valuation date for the shares; however, they strongly disagree in their respective interpretations of how long the "reasonable time" should extend from the time plaintiff first received notice of the conversion.

As stated above, plaintiff argues that she is entitled to judgment equal to the amount of the proceeds resulting from the July, 1986 sale of the stock to a third party. This sale was consummated after this action was commenced but prior to our September 7, 1989 opinion. She relies heavily on *Hayward v. Edwards, supra*, to support her argument that the reasonable time in the present action should extend from May, 1973 to July, 1986 because she was an infant when the conversion occurred. Plaintiff's Memo at 5–7.

Defendant contends that the stock should be valued as of June, 1973, one month after plaintiff's father received notice of the conversion and demanded that defendant return the shares to plaintiff. He argues that plaintiff's reliance on *Hayward, supra*, is misplaced because in that case (1) the circumstances were such that "involved a 'likelihood that a long lapse of time would pass before discovery' (4 N.Y. S.2d at 703) and (2) plaintiff, an infant, had no knowledge of stock trading." Defendant's Memo at 9. It is defendant's contention that unlike the defendant in *Hayward*, he immediately notified plaintiff's father of the May, 1973 sale of the stock, thus eliminating any likelihood of a long lapse of time before discovery. Defendant maintains that once plaintiff's father was notified of the conversion, he acted as plaintiff's agent; therefore, plaintiff, through her father (who knew the art of stock trading), was fully informed at all times of the status of the stock. Thus, defendant argues, reliance on *Hayward* is inappropriate and misplaced. *Id.* at 10. We disagree.

The facts in *Hayward* are strikingly similar to what confronts us here. In *Hayward*, defendant, plaintiff's uncle, converted a stock certificate belonging to plaintiff by forging plaintiff's name and transferring the certificate to a third party. At the time of the conversion, August, 1934, plaintiff was ten years old. The conversion was discovered by someone in plaintiff's family in January, 1935. Plaintiff brought suit by a guardian *ad litem* in February, 1936, and the matter was tried in January, 1938, when plaintiff was 13 or 14 years old. 167 Misc. 694, 695, 4 N.Y.S.2d 699, 701.

In the instant case, while it is true that defendant notified plaintiff's father soon after he sold the stock to Kaufman, he never informed plaintiff or her father of the hypothecation of the stock which occurred in January, 1973, four months before the sale of the stock and two months

before plaintiff's father resigned from SICC. 720 F.Supp. at 1093–94. Had plaintiff's father not decided to leave SICC, there could possibly have been a longer duration between the hypothecation of the stock by defendant and discovery by plaintiff or her father. Indeed, plaintiff's father discovered the conversion, in the form of the sale of the stock by defendant, more than four months after the original act which gave rise to a conversion claim. The time between conversion and discovery by plaintiff's family in *Hayward* was four to five months—practically the same length of time as herein. 167 Misc. at 695, 4 N.Y.S.2d at 700–1. In both cases, there was a possibility of a long duration between the conversion and discovery thereof. *See id.* at 697, 4 N.Y.S.2d at 703. Consequently, we find that the instant matter is not distinguishable from *Hayward* on this point.

Second, plaintiff was not fully informed at all times as to the status of the stock. Like the plaintiff in *Hayward*, she was an infant at the time of the conversion and had no personal knowledge of the art of stock trading. Furthermore, the actions of plaintiff's father were insufficient to justify a finding that he was acting as her agent. We had already concluded as much when we determined that the applicable statute of limitations had tolled, preserving plaintiff's cause of action. Memorandum Of Court, filed November 7, 1985. Plaintiff's father did not bring an action as her guardian *ad litem*, nor was he under a legal obligation to do so. *Frehe v. Schildwachter*, 289 N.Y. 250, 45 N.E.2d 427 (1942) (infant plaintiff has the right to maintain an action by a guardian *ad litem*, but she also has the right to defer any action until she reaches the age of majority). Because plaintiff's father was not acting as plaintiff's agent or guardian, his knowledge of the conversion will not be imputed to her. "The law appoints no mentor to act for [plaintiff] and thus impute knowledge to [her]." *Hayward*, 167 Misc. at 696, 4 N.Y.S.2d at 702. Therefore, plaintiff was not in the position of a fully informed adult at the time of the conversion or in the time thereafter; rather, she was

an uninformed infant who lacked even the most rudimentary knowledge of stock trading or business transactions. Accordingly, we conclude that *Hayward* is not distinguishable on either point that defendant has raised.

*Hayward* is also instructive in fixing a valuation date for determining damages owing to an infant shareholder whose stock has been converted. That court was faced with the issue of fixing the termination date of the reasonable time after discovery of the conversion of the shares of stock that belonged to the infant plaintiff. After consulting with authorities, the *Hayward* court weighed the competing policy considerations that regulated the determination of the reasonable time, the most important of which are the rationale that led prior courts to establish the reasonable time rule, the imperative that plaintiff must make every attempt to mitigate her damages, and the stated desire of New York law in general to protect the rights and interests of infants and minors. 167 Misc. 694, 695–6, 4 N.Y.S.2d 699, 701–3.

In its final analysis, the court applied the reasonable time rule, but extended it from the date of discovery through the date of trial, a period of three years; however, it fixed the valuation date at six months after discovery because it was at that time that the stock reached its highest value. *Id.* at 697, 4 N.Y.S.2d at 703. The court reasoned that while the infant plaintiff may have known of the conversion, he had not yet discovered his loss, for the purpose of charging him with taking the proper action to keep down his damages, until he instituted the action and moved it to trial. Explicit in the court's decision was the rationale that plaintiff was charged with knowledge because a suit was instituted through his guardian *ad litem*, but not because the knowledge of the guardian *ad litem* was imputed to him. Implicit in the court's reasoning was that plaintiff had not discovered the conversion because he was a minor, and, had he waited until the age of majority to bring an action, he would have been charged with knowledge thereof when the disability of minority was removed. We interpret the court's reasoning to mean

that the reasonable time would have extended to some time shortly after plaintiff reached the age of majority, had he not brought suit by his guardian *ad litem. See Id.*

Defendant points to the holding of the Supreme Court in *Galigher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889), wherein the Court explained the reasoning of the New York Court of Appeals in arriving at the reasonable time rule and for limiting the reasonable time to a short duration:

> The hardship which arose from estimating the damages by the highest price up to the time of trial, which might be years after the transaction occurred, was often so great, that the Court of Appeals of New York was constrained to introduce a material modification in the form of the rule, and to hold the true and just measure of damages in these cases to be, the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock.

*Id.* at 201, 9 S.Ct. at 337, 32 L.Ed. at 661 (cites omitted).

However, *Galigher,* the New York cases cited therein, and the entire line of authorities cited by defendant are clearly distinguishable on the facts from this case, making *Hayward* all the more instructive and persuasive. In each of those cases the individual whose stock was converted was an adult who either had first-hand knowledge of stock trading or had such a knowledge of business transactions that each could decide to either purchase replacement stock or remain out of the market and sue to recover damages.

The *Hayward* court noted, and we agree, that the presence of unique circumstances in that case demanded a different result than was reached in the other conversion cases:

> No one can read the cases without concluding that the "reasonable time" rule as established by them presumed that the plaintiff had a knowledge of stock trading. A theory is constructed in those decisions to the effect that plaintiff would have done that which would have brought him the greatest return on his investment, if his possession of the securities had not been interfered with. For instance, in fixing that "reasonable time" the courts have said that the victim was entitled to time after discovery in which to decide upon what course to follow in adjusting his affairs. He might want to consult the market quotations; to advise with experts in trading; to raise the cash required for another purchase of stock or to repurchase the same securities that were converted. That analogy will not be questioned were the one whose property was taken had the capacity to decide things of that nature. But a ten year old boy *knows nothing of stock trading, consulting, repurchasing or fund raising.*

*Hayward v. Edwards,* 167 Misc. at 696, 4 N.Y.S.2d at 701-2 (citations omitted) (emphasis ours).

Furthermore, in *Gerdes v. Reynolds,* 30 N.Y.S.2d 755 (Sup.Ct.Sp.T.N.Y.Co.1941) another case involving the conversion of stock owned by an adult, the court sought to trace the history of the reasonable time rule through the date of that case. The court recognized that while the *Hayward* court had adhered to the reasonable time rule, it nonetheless extended the reasonable time for a much longer duration than had previously been applied in any other case because "of the peculiar circumstances of that case, which involved the theft of securities belonging to an infant." 30 N.Y.S.2d 755, 762. We agree with the *Hayward* and *Gerdes* courts that the infancy of the plaintiff is a particular fact that must lead us to extend the reasonable time for some longer duration.

Defendant argues that the Statute of Limitations, N.Y.C.P.L.R. § 208, does not entitle plaintiff to recover an increased award of damages. Defendant's Reply Memorandum Of Law ("Defendant's Reply"), at 5. We agree. However, the longstanding and far-reaching policy in New York is to protect infants and minors in situations where they are presumed to lack the adequate experience and knowledge re-

quired to make well-informed decisions. For instance, individuals under the age of 18 are required to secure parental consent in order to marry, those under 16 must obtain parental and judicial consent, and those under 14 are prohibited entirely from marrying. N.Y.D.R.L. §§ 15(2), (3), 15–a. The purpose of the law is to insure mature decision making and to prevent unstable marriages. *Moe v. Dinkins*, 533 F.Supp. 623 (S.D.N.Y.1981), *aff'd*, 669 F.2d 67 (2d Cir.), *cert. denied*, 459 U.S. 827, 103 S.Ct. 61, 459 U.S. 827 (1982). Similarly, individuals under the age of 18 cannot dispose of real or personal property by will, N.Y.E.P. T.L. § 3–1.1, and they are considered incompetent—due to their age—to receive letters testamentary or letters of administration, N.Y.S.C.P.A. § 707, or to effectively execute a power of attorney. N.Y.G. O.L. § 5–1502G. *See Matter of Peters*, 71 Misc.2d 662, 336 N.Y.S.2d 712 (Surr.Ct.Cattaraugus Co.1972).

Additionally, contracts entered into by minors are generally voidable by the minor at any time prior to ratification, N.Y.G.O.L. § 3–101; *Ruppert v. Secretary of United States Dept. Health & Human Svcs.*, 671 F.Supp. 151 (E.D.N.Y.1987), *aff'd in part, rev'd in part* 871 F.2d 1172 (2d Cir.1989), whereas a contract entered into by one who has reached the age of majority is fully enforceable because the individual is deemed to have the legal capacity to enter into a binding contract. *New York City Health & Hospitals Corp. v. Spell*, 140 Misc.2d 847, 531 N.Y.S.2d 686 (Civ.Ct.N.Y. Co.1988). Furthermore, infants who are performing artists and professional athletes must have any contract for their services judicially approved; this review by the court, which when given acts to make the contract binding against the infant, serves to insure that the terms of the contract consider the interests of the infant. N.Y. Arts & Cult. Aff. L. § 35.03; *Shields v. Gross*, 58 N.Y.2d 338, 448 N.E.2d 108, 461 N.Y.S.2d 254 (1983).

Finally, even though infants may be held responsible for their negligent torts, generally a lesser standard of care applies than would in the case of an adult: the applicable standard of care used to determine whether an infant is negligent is that which it is reasonable to expect of children of like age, intelligence and experience.[1] *Comeau v. Lucas*, 90 A.D.2d 674, 455 N.Y.S.2d 871 (4th Dep't.1982), *Mochen v. State*, 43 A.D.2d 484, 352 N.Y.S.2d 290 (4th Dep't. 1974).

We find that the pervasive policy in New York to protect the rights and interests of infants and minors, as exhibited by the aforementioned examples, should be extended to plaintiff in the instant case. Additionally, we are persuaded by the reasoning of the *Hayward* court. Plaintiff was an infant at the time of the conversion. For that reason alone, we find that she was not aware, for the purpose of charging her with mitigating her damages, that the conversion occurred until she reached the age of majority. *See Hayward, supra*, 167 Misc. at 697, 4 N.Y.S.2d at 703.

We agree with defendant's contention, well established in New York law, *Den Norske Ameriekalinje v. Sun. Printing & Publishing Assoc.*, 226 N.Y.1, 122 N.E. 463 (1919); *Wilmot v. State*, 32 N.Y.2d 164, 297 N.E.2d 90, 344 N.Y.S.2d 350 (1973); *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489 (2d Cir.1985), that plaintiff had a duty to mitigate her damages. Once the disability of minority was removed, she was chargeable with knowledge of the conversion and with the responsibility of keeping her damages to a minimum. Plaintiff was born January 6, 1965 and attained majority on January 6, 1983, Complaint ¶ 13; consequently, we fix January 16, 1983, ten days after plaintiff reached the age of majority, as the termination date of the reasonable time. The ten day period allows plaintiff to exercise her judgment and consult with counsel, without the impediment of minority, to de-

---

1. An exception applies when an infant engages in an activity normally undertaken by an adult, such as driving a car or playing golf: the infant may then be held to a standard of adult skill, knowledge and competence. *Neumann v.*

*Schlansky*, 58 Misc.2d 128, 294 N.Y.S.2d 628 (Sup.Ct.West.Co.1968), *aff'd* 63 Misc.2d 587, 312 N.Y.S.2d 951 (Sup.Ct.Sp.T.West Co.1970), *aff'd* 36 A.D.2d 540, 318 N.Y.S.2d 925 (2d Dep't.1971).

cide what course to take on the matter. Accordingly, plaintiff is entitled to the highest intermediate value of the shares between May, 1973 and January 16, 1983, plus interest thereon from the date the stock attained its highest value. N.Y.C.P. L.R. § 5001.

■ Defendant, relying on two recent Appellate Division cases,[2] argues that whatever amount to which plaintiff is entitled should be reduced by at least 25% because the stock was a minority interest in a closely held corporation and thus not marketable. Defendant's Memo at 13. We disagree. A closer reading of the two cases cited by defendant reveals that they involved circumstances in which an individual shareholder filed a petition for a judicial dissolution of the corporation and the corporation in turn elected to buy out the individual's interest. The trial courts were responsible for determining the value of the stock for the purpose of such a sale. That is not the case here. The purpose is not to establish a value for the stock in the context of a dissenting shareholder, a tax valuation or due to a judicial dissolution; rather, we must determine what the stock would have been worth had plaintiff's interest not been interfered with. *See* Haynsworth, *Valuation of Business Interests*, 33 Mercer L.Rev. 457 (1982). Additionally, defendant cites no authority to support its position that a discount of valuation is appropriate in the context of fixing damages for conversion of stock. Indeed, none of the cases cited by either party which dealt with stock of a closely held corporation made any mention of applying a discount to the amount of damages. The stated rule of conversion damages is that plaintiff is entitled to the full value of the stock within a reasonable time after discovery of the conversion. *Hartford Accident & Indem. Co. v. Walston & Co., Inc., supra.* There is no provision for a discount under those circumstances; consequently, we decline to apply one.

Finally, the hardships discussed in *Galigher, supra,* regarding the determination of the value of stocks as of certain dates, are less onerous in today's business market. Indeed, many electronic and technological advances have been made since *Galigher* was decided 102 years ago which make it easier to ascertain the values of stocks, both publicly and closely held, as of particular dates. Hence, by extending the reasonable time, we do not believe we will be adding an undue burden to the process of determining the amount of damages.

## II. Punitive Damages

We next turn to the issue of whether plaintiff is entitled to punitive damages as a result of the conversion of the stock by defendant.

Plaintiff, relying on what she describes as "this court's finding of intentional wrongdoing," contends, without further specificity, that she is entitled to punitive damages. Plaintiff's Memo at 14. Defendant argues that plaintiff is not entitled to punitive damages because defendant's act of conversion was not accompanied by the requisite mental state that would warrant the assessment of punitive damages. Defendant's memo at 14.

■ Imposition of punitive damages for conversion of personal property will be justified where circumstances show that the conversion was accomplished with malice, insult, reckless and willful disregard for plaintiff's rights, or by other proof evidencing the aggravated nature of the act. 23 N.Y.Jur.2d *Conversion,* § 74 (1982); *Fraser v. Doubleday & Co., Inc.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984). "An act is done maliciously when it is done deliberately with knowledge of the plaintiff's rights and with the intent to interfere therewith." *Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.,* 106 Misc.2d 866, 869, 435 N.Y.S.2d 438, 441 (Sup.Ct.N.Y.Co.1980), *modified on appeal to delete punitive damages,* 81 A.D.2d 650, 441 N.Y.S.2d 408 (2d Dep't.) *aff'd,* 54 N.Y.2d 891, 444 N.Y. S.2d 918, 429 N.E.2d 425 (1981). Additionally, punitive damages "are allowed where

---

**2.** *Blake v. Blake Agency Inc.,* 107 A.D.2d 139, 486 N.Y.S.2d 341 (2d Dep't.1985); *Matter of Fleisch-* er, 107 A.D.2d 97, 486 N.Y.S.2d 272 (2d Dep't. 1985).

the wrong is aggravated by evil motives...." *Merrick v. Four Star Stage Lighting, Inc.*, 60 A.D.2d 806, 400 N.Y.S.2d 543 (1st Dep't.1978).

In *Ashare v. Mirkin, supra*, plaintiff, an attorney, agreed to bring his law library and office furniture to his firm's new office for use by members of the firm. Defendants, plaintiff's former partners, agreed that plaintiff would retain ownership of the library and furniture, and the firm would maintain and keep the library current during plaintiff's employment. Nearly two years later, when plaintiff gave notice that he was leaving the firm, the parties discussed the possible purchase of plaintiff's property by defendants. After initial discussions, defendants refused to discuss the matter further, claimed the property as their own, and rejected plaintiff's demand that they return the property. 106 Misc.2d at 869–70, 435 N.Y.S.2d at 441. The trial court found that defendants converted plaintiff's property in retaliation for plaintiff's decision to leave the firm. *Id.* at 870, 435 N.Y.S.2d at 441. The court, "considering the nature of the defendants' willful and malicious conduct" in converting plaintiff's property and in labelling him an "ingrate" for wanting to leave the firm, awarded plaintiff punitive damages. *Id.* The Appellate Division modified the trial court's judgment to delete the award of punitive damages, stating that even "[u]nder the circumstances, there was no basis for the award for punitive damages." 81 A.D.2d 650, 441 N.Y.S.2d 408.

 The circumstances of the instant case are quite similar to those in *Ashare v. Mirkin*. Plaintiff's father put the stock in plaintiff's name and agreed with defendant that defendant would have the right to vote the shares while plaintiff would retain ownership rights. Transfer of ownership or control was never considered. When plaintiff's father decided to resign from SICC, defendant told him he was "sick", and within six weeks thereafter sold plaintiff's stock. In our September 7, 1989 opinion, we concluded that defendant's "impetus for selling the stock was a combination of retaliation and desire to keep ownership in the hands of insiders." 720 F.Supp. at 1094. We also found that defendant's anger over the decision of plaintiff's father to leave SICC "played a major role in the relatively quick sale of the stock." *Id.* When plaintiff's father rejected the proceeds of the sale and demanded the return of the stock, defendant refused to comply.

We are persuaded by our examination of *Ashare v. Mirkin* and other applicable cases cited above; accordingly, we are compelled to conclude that while defendant's actions resulted from his anger at and his retaliatory intent toward plaintiff's father, those actions do not evidence the requisite malice, reckless and willful disregard for plaintiff's rights, or aggravation caused by evil intentions that would justify the imposition of punitive damages. Accordingly, we find that under the circumstances, there is no basis on which we can justify awarding punitive damages to plaintiff. *See, Ashare v. Mirkin, supra*, 81 A.D.2d 650, 441 N.Y.S.2d 408 (2d Dep't.) *aff'd*, 54 N.Y.2d 891, 444 N.Y.S.2d 918, 429 N.E.2d 425 (1981).

## CONCLUSION

In accordance with the foregoing, we are constrained to, and do, fix January 16, 1983 as the termination date of the reasonable time for the purpose of determining the value of the shares. Plaintiff is entitled to the full amount of the highest value attained by the stock from discovery of the conversion in May, 1973, to January 16, 1983, plus interest from the date the stock attained its highest value. Furthermore, we decline to impose a constructive trust upon defendant for the proceeds of the sale of the stock. Finally, plaintiff is not entitled to recover punitive damages.

We again choose to follow a practice that has met with great success in this Court: we direct plaintiff and defendant to endeavor to agree upon a reasonable and proper amount of damages, based upon our formula, and to provide us with a proposed form of judgment, including the amount agreed upon. If the parties cannot reach an agreement before May 1, 1991, they are to notify us in writing by May 1, 1991, and a

date will be fixed immediately thereafter for a hearing strictly limited to the issue of the amount of damages owing to plaintiff from defendant.

SO ORDERED.